Filed 12/11/23  P. v. Watson CA1/4

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>BRANDON MATTHEW WATSON,<br><br>    Defendant and Appellant. | A163908<br><br>(Humboldt County<br>Super. Ct. No. CR1804975)<br><br>~(Hon. Lawrence M. Killoran)~ |

A jury convicted Brandon Matthew Watson of first degree murder and two assaults, and he was sentenced to state prison for 37 years to life. Watson now appeals.

The appeal assigns six primary claims of error.  Watson contends the trial court (1) committed *Batson* error (*Batson v. Kentucky* (1986) 476 U.S. 79 (*Batson*)); (2) violated his constitutional right to a public trial; (3) erred by allowing him to be cross-examined about certain attorney-client privileged matters; (4) erred by allowing the prosecution to amend its information near the end of trial; (5) erred by denying his motion under *People v. Marsden* (1970) 2 Cal.3d 118 (*Marsden*) for the appointment of new counsel; and (6) erred in imposing certain determinate sentences.  In addition, should we rule against him on certain of these matters, Watson argues in the

1

alternative in this appeal and in a related petition for writ of habeas corpus that he received ineffective assistance of counsel.

We affirm, except we vacate two of Watson's determinate sentences and remand this case to the trial court for resentencing.  For one of the assault counts, a full resentencing will be required to account for recent legislation governing triad sentencing; and for each of the assault counts, an error in selecting the full three-year term for a great bodily injury enhancement must be corrected.  By a separate order issued on the same date as this opinion, we deny Watson's habeas petition in its entirety.

## I. BACKGROUND

The operative pleading below, a second amended information filed by the Humboldt County District Attorney in June 2021 during trial, charged Watson with committing one count of murder (Pen. Code,[1] § 187, subd. (a)) in 2018 and committing two counts of assault with a deadly weapon, a knife (§ 245, subd. (a)(1)), in 2016.  It further alleged that Watson personally used a deadly or dangerous weapon, a knife, in the commission of the murder in 2018 (§ 12022, subd. (b)(1)) and personally inflicted great bodily injury during each of the assaults in 2016 (§ 12022.7, subd. (a)).

### A. *The 2016 Incident*

#### 1. The Prosecution's Case

The prosecution relied chiefly on the testimony of two men who the jury found were Watson's assault victims, Brian Edwards and Antony Bessellieu-Hill.  Summarized as a whole, their testimony was as follows.

Edwards went to a bar in Eureka on the night of February 14, 2016, accompanied by some friends, including Bessellieu-Hill, a correctional officer at a local jail.  At some point, Edwards and Bessellieu-Hill went outside the

---

[1] Undesignated references are to the Penal Code.

2

bar to smoke cigarettes. As they stood outside, Bessellieu-Hill told Edwards that recently a lot of members of the 18th Street gang were in the jail. Watson, who overheard the comment, approached the two men and said, " 'Fuck 18th Street. This is South Side Crip.' " He told Bessellieu-Hill and Edwards they did not know what they were talking about. Watson said he was a Crips gang member, and asked them where they were from.

In response to Watson's statement that he wanted to tell them about gangs, Edwards said, " 'I don't give a shit, man,' " and turned away. Watson then punched Edwards on the side of his face, which led Edwards to grab Watson, and the pair fell to the ground, with Edwards winding up on top of Watson. They threw punches at each other and a few people kicked Watson. The fight was eventually broken up and bar bouncers told Edwards and Bessellieu-Hill to leave, guiding them back into the bar so they could exit by a back door and avoid Watson, who the bouncers instructed to leave by going down the street.

As Edwards and Bessellieu-Hill went back into the bar, one of their friends confronted an angry Watson about the fight. The friend testified that during the confrontation, Watson said, " 'Your friends aren't gonna be so cool once I get my friends and my piece.' " Watson then got on his phone and walked in the direction of a nearby alley.

Edwards and Bessellieu-Hill exited the bar's back door into the alley. Watson was there with some other people. Edwards and Bessellieu-Hill tried to re-enter the bar, but the back door had closed and locked behind them. Watson immediately approached Edwards and threw a punch at him. Edwards evaded the punch, took Watson down to the ground, and, while on top of him, held him in a kind of a bear hug. Edwards felt four to five

3

punches in his back. Bessellieu-Hill saw Watson striking Edwards on the back and that Watson was the only one hitting Edwards.

A knife-wielding man approached Bessellieu-Hill, cut him on the arm, and stabbed him three to four times in his abdomen. Then, as Bessellieu-Hill went to help Edwards up, Watson stabbed him from behind four times, in his neck, lung, and kidney. Edwards saw a bloody, unarmed Bessellieu-Hill up against a dumpster, covering his face with his arms while Watson struck him multiple times with one hand. One of Watson's companions told Edwards, " 'You're fuckin' with my homey.' " When Edwards replied, " 'It was one-on-one,' " the man said, " 'I don't give a fuck,' " and kicked Edwards in the stomach.

Watson and the others who were with him eventually ran away. Edwards observed that Bessellieu-Hill had multiple stab wounds, mostly on his left side, to his arms, belly, neck, and under his arm. Bessellieu-Hill had three surgeries, was bedridden for five to six months, and suffered nerve damage in his back and legs and from post-traumatic stress disorder. Edwards was stabbed four times and suffered a punctured lung, a punctured diaphragm, and a hernia on his surgical scar. He too had surgery, was unable to work for a month and a half, and needed two months of out-patient treatment.

### 2. The Defense Case

A Eureka police detective testified that he interviewed Bessellieu-Hill and Edwards at a hospital on the same day of the 2016 incident; recordings of these interviews were played at trial and transcripts of them are contained in the record. The detective testified that when he interviewed Bessellieu-Hill, Bessellieu-Hill was "a little freaked out," was in pain and significant medical distress, and did not seem intoxicated. Bessellieu-Hill told the detective he had had five or six alcoholic drinks the night of the incident. He and

4

Edwards were attacked by a group of about six people. He was stabbed by a man who was about five feet, nine inches tall, "looked kinda like either native, or Hispanic," had long black hair, and "was saying he was a Sureno or something."

When the detective interviewed him at the hospital, Edwards also was in significant medical distress. Edwards said he had gotten into a fight with a man who was five feet, eight or nine inches tall, which, the detective testified, was consistent with Watson's height as observed by the detective at trial. Edwards said the man had long, dark brown or black hair and a trimmed beard, and told Edwards he was from Arizona, Sicilian, and a "south side crip." According to Edwards, there were about eight people in the alley who rushed at him and Bessellieu-Hill when the two exited the bar's back door, including the man he had fought with in the front of the bar. He took one man down to the ground and thought he was kicked or punched in the back. He did not see the man who stabbed him, and thought the man "was just in the crowd." He only realized he was stabbed after he had gotten up and Bessellieu-Hill said he, Bessellieu-Hill, had been stabbed.

Watson, 29 years old at the time of trial, testified that between the ages of 10 and 20, he was involved in approximately 20 fights, but that he was involved in only one or two fights in his twenties. Once, he was jumped by 10 people and seriously injured; another time, when he was in his twenties, one of his eyes was seriously gouged, affecting his vision for a time. As a youngster, he associated with Crips gang members and later with Sureno gang members. He no longer associated with gang members in his twenties, but he had extensive knowledge of the gangs in Humboldt County. He was neither an active gang member nor associating with gang members in 2016.

5

Watson testified that on the night of the incident, February 14, 2016, he smoked marijuana and drank two to three beers. Standing outside the Eureka bar near Edwards and Bessellieu-Hill, he heard the two men, who obviously had been drinking, bragging about gangs as if they were gang-affiliated. Watson laughed at them and said, " 'Fuck 18th Street,' " and, " 'Are you serious?' " At first, the conversation was friendly, but when he told them who he was "affiliated with," an apparent reference to a past or present gang affiliation, Bessellieu-Hill told him there was "no way that's possible" because he was "a white guy." Watson was irritated because he was of Native American and Sicilian heritage, and the men then started "harassing" him by telling him he "was basically tripping." They also started "posturing up" as if "they were ready to start beating somebody up." Edwards then told him they were white so none of it applied to them, and both men told him to " '[g]et the fuck out of here.' "

Watson thought he was going to be attacked because the two men were "posturing up" as he had seen in the "plenty of fights" that he had been in, and he was "a little angry" when Edwards told him to leave, so he punched Edwards in the face. Bessellieu-Hill hit Watson in the jaw and pulled Watson's beanie over his face; the two men then dragged him to the ground and kicked and punched him as Edwards yanked him around by his hair. Someone kicked Watson in the eye, causing his eye to swell shut, and Edwards got on top of him. A bouncer pulled Edwards off of him.

Watson walked into an alley behind the bar to see if he could find someone to give him a ride and found two people there who he knew (he testified at one point that they were friends and at another point that they were just acquaintances). Edwards and Bessellieu-Hill came out the bar's back door. Bessellieu-Hill looked at Watson, said something like "fucker,"

and charged him. Watson's eye was swollen shut (it was swollen and blackened in a photograph taken several days after the incident and shown at trial) and his previously separated shoulder had been displaced in the initial incident, causing him to be afraid in the moment. Edwards pinned him to the ground and repeatedly hit him in the face. As he was being suffocated and hit and was unable to get up, he unclipped his pocketknife, flipped it open, and stabbed Edwards in the side. He at first testified that he did not recall stabbing Edwards but was told later by a friend that he had done so; he later testified that he "[v]aguely" recalled stabbing him. Edwards got up and Watson left.

Watson denied stabbing Bessellieu-Hill, did not know who stabbed him, and did not believe any of the others with him that day stabbed Bessellieu-Hill. Although Bessellieu-Hill testified he also was stabbed by another person in the alley, Watson refused on cross-examination to identify the others with him that day despite the court's order that he answer the prosecutor's questions.

The parties stipulated that the blood alcohol content for Edwards and Bessellieu-Hill as measured at the hospital shortly after the incident were .139 and .161 respectively.

Watson testified that he turned himself in after the incident and was arrested, apparently for a probation violation. He was soon released without being charged regarding the incident.

## B. *The 2018 Incident*

### 1. The Prosecution's Case

The evidence pertaining to the 2018 incident centered on statements to police by Sage Aron Rios concerning events that occurred in the early morning hours of October 25, 2018. Rios testified at trial that he was then around 21 and had been drinking heavily the previous day and night. Late

7

into the evening of the 24th, Rios testified, he and Peter "Bo" Triantos were in an area crowded with people outside a bar in Arcata.

According to Rios's statements to a police detective shortly after the incident, Watson, who had been involved in a relationship with Rios's aunt some years before, approached Rios and said he owed Watson $40. After a back-and-forth verbal exchange, Watson claimed he was a Crips gang member and Triantos laughed. Watson punched Triantos, which led both Triantos and Rios to slam Watson down in the middle of the street.

Rios's statements to a police detective shortly after the incident indicate that Triantos and Rios went from the bar to a nearby alley to continue the fight. Video surveillance footage shown at the trial, taken from a store surveillance camera on the other side of the street, shows from a distance the front of the bar and the street in front of it in the upper left portion of the frame.

In the video, there is a crowd of perhaps 10 to 15 people, shadowy figures on the video, standing on the sidewalk in front of the bar.[2] At around 1:33 a.m., there appears to be some sort of physical confrontation among them. After moving into the street, things appear to calm down after about a minute, and then the people return to the sidewalk. A crowd remains there until about a minute and a half later, when it appears another brief physical confrontation occurs among them, after which about a half a dozen people begin walking, most of them in the street, toward a nearby corner to the right of the bar where an alley is located.

---

[2] An Arcata police detective testified at trial that the video was from a store surveillance camera across the street from the bar, and he also identified Watson, Triantos, and Rios in the video.

The group walking toward the corner includes Watson, Triantos and Rios. Triantos walks ahead of the rest of them, and when he nears the alley's entrance, he turns around, strides back several steps and knocks the hat off of Watson's head; it is unclear if he does so from the front or back of Watson's head. At that point, Triantos turns and heads into the alley, and the others head in that direction as well. Watson, after taking some steps towards the alley, turns around and walks back to retrieve his hat, which is lying in the street. He picks it up as the other people are some feet away from him heading towards the alley's entrance.

Without hesitation, Watson strides into the alley. At the alley's entrance, he encounters Rios, Triantos, and a third person, and Rios shoves him back. Watson recovers and walks quickly towards Triantos, and they disappear into the alley. Around this time, some more people head into the alley besides the original group. About fourteen seconds later, Rios and Triantos appear again, walking out of the alley together, followed by others a few moments later.

Besides the surveillance video documenting the circumstances immediately before and after the alley fight, there was other evidence of what occurred in the alley, including most significantly Rios's account to police, in which he said Triantos and Watson rushed at each other, and Watson stabbed Triantos with a knife in the left upper abdomen, the back of the left shoulder, and the left side of the neck. Triantos had other injuries, such as bruises on his face and lip. But he died from the stab wound to his abdomen.

Following the stabbing of Triantos, Rios later told his friends' roommates what had happened, and one of the roommates contacted the police. Subsequently, in a police interview, Rios identified a photo of Watson from a photographic lineup as the person who stabbed Triantos, and also

9

identified a still photo of Watson, taken from surveillance video of the alley that was recorded right after the stabbing, as the person as well.

Rios equivocated on the identification at trial. He testified that, because he was intoxicated and had been using a drug, he could only recall that an altercation occurred outside the bar after he saw Watson, he did not remember much of anything about the altercation, and he did not recall seeing the stabbing. He denied telling police that Watson had stabbed Triantos.

When Watson returned to the apartment he shared with his girlfriend, he made some statements about what had happened. His girlfriend told an investigating police detective that Watson said he had been "jumped by six people," "defended himself," and ended up "having to stab someone," but that he also said "it wasn't a big deal because he hadn't hurt them that bad." She also said Watson did not have his pocketknife with him when he returned to the apartment, and was wearing different clothing than he had on when he left the apartment earlier that evening. He said people were after him, something about Surenos, and that he needed to leave.

Later that same day, Watson went to a friend's home, said he was in trouble and that the police were looking for him, asked if the friend had anything with which he could disguise himself, and offered to pay her for a ride out of town. She contacted police and Watson was soon arrested.

Five days after the stabbing, Watson's girlfriend visited him at the jail. As recounted at trial by a police detective who listened to a recording of their conversation, Watson said he was going to try to "plead self-defense as much as possible" but that he knew and "they" knew that he "fucked up."

In a subsequent jail telephone conversation, also recorded and recounted at trial, Watson told his girlfriend that, although it was an

accident, Rios "started shit always." He added, "It wasn't about money. It was about respect." During another jail visit six days later, Watson told his girlfriend that "a bunch of bad shit" happened to him that night and he "took care of it."

### 2. The Defense Case

Watson testified that he had about eight or nine drinks before going to the bar in Arcata on the night of the 2018 incident, causing him to be "buzzed, but not intoxicated." As he walked up to the bar, he saw Rios standing among about 20 people outside. Rios, contrary to Watson's advice, said he had joined a gang, and this had caused a rift between them. On the night of the incident, Watson greeted Rios and jokingly asked him about money he owed Watson. Rios, who seemed inebriated, clenched his fists, raised his chin, and told Watson not "to punk" him because he was 22 years old and "a grown ass man." Two other individuals joined Rios. The three stood on a curb above Watson, who stood in the street.

Rios told Watson he wasn't "shit" and was not a Crips gang member. Triantos and the other man laughed and Triantos said, "You? You're a Crip?" Rios was "basically posturing up" at Watson like "he was prepared to fight." Watson understood from the many fights he'd been in before and the times when he'd been jumped that he was "about to get into a fight" and that "the best defense is a good offense in a situation like that," so he punched Triantos in the mouth. Rios struck Watson on the side of the face. Watson slipped, fell to his knee, was hit by Rios, Triantos, and a third person, and went to the ground. He was punched and kicked, including in the face and head, by the three until a bouncer broke up the fight.

Watson wanted to go home. He tried to talk to the woman who drove him there, but she was incoherent. He walked toward an alley near the bar in order to go to the parking lot where the woman had parked her car so that

11

he could "get out of there." Rios kept coming back to him, calling him names, posturing, and saying, "Let's fight." Watson did not want to fight anymore and shook his head. Triantos punched him in the back of the head hard enough for Watson to see stars, knocking off his hat, and then went into the alley. Watson was "a little hurt" from being hit in the body, one of his eyes was swollen shut, and he had some dizziness. He was concerned about being jumped again because he had suffered brain damage in a previous fight and feared that he would sustain more brain damage.

In the alley, Watson was surrounded by six or seven people. He was scared by Triantos's posturing, thinking it meant Triantos was going to pull out a weapon. Triantos swung first and struck Watson in the forehead, then swung at least three or four more times without connecting. Watson went into "survival mode." He pulled his knife from his pocket, flipped it open with one hand, and stabbed Triantos in the mid-section. He did not remember striking Triantos anywhere else with the knife but later, after working with his attorneys and going over reports and pictures, he thought he also stabbed Triantos in the neck and back.

Watson, not thinking Triantos's injuries were fatal, left and briskly walked two or three miles to the apartment he shared with his girlfriend. On the way, he heard sirens and discarded his pocketknife. A friend arrived at his apartment shortly after him. When Watson learned Triantos had died, he wanted to leave the area and raise enough money to hire a lawyer.

Watson also acknowledged on cross-examination that he had recently physically attacked a cellmate when the cellmate disrespected him and assumed a physical posture suggesting he was going to fight Watson.

A forensic toxicologist testified that he analyzed a toxicology report for Triantos. Triantos had a blood ethyl alcohol content of 0.05 percent, which

would be considered a "moderate" level of intoxication, the equivalent of two to three standard drinks for an average-sized man. There were 0.02 milligrams per liter of Benzoylecgonine, a metabolite of cocaine, and 0.25 milligrams per liter of ketamine, an anesthetic and popular club drug that induced a relaxed, sedated and euphoric state, in Triantos' system. The metabolite measurement indicated Triantos had used cocaine within one or two days of his death. The ketamine measurement indicated "pretty typical" illicit use. It would be expected that ketamine mixed with alcohol would lead to greater intoxication and a potentially anesthetic effect.

### 3. The Prosecution's Rebuttal Evidence

A police detective interviewed Watson about the stabbing soon after his arrest in 2018, recorded excerpts of which the prosecution played for the jury in rebuttal. In these excerpts, Watson told the detective that, while he thought he had acted in self-defense, he remembered little about the stabbing incident. These excepts highlighted a series of incriminating statements Watson made to the detective, including the following: (1) that there was "no way to justify what happened"'; (2) that "let's just say this was just me defending myself as usual okay something like this happened before"; (3) that he had "too much of a temper" to go out and had often gotten into fights with people he knew who were "busting [his] balls," which was "kind of what happened" initially this time; (4) that someone else threw the first punch, though he did not remember who because he was so drunk; (5) that he tried to find "those girls," apparently the ones who drove him to the bar, after the initial fight in order to get away; (6) that it might not have been him who stabbed Triantos and that he did not decide to stab him; (7) that he had been gangbanging "forever," was part of a Eureka gang; that "as far as the way we handle things I guess I can never let anybody just bug

13

me"; (8) that he had a "habit" of throwing things away such as his knife; and (9) that he ran home after the incident.

## C. *The Jury Verdict, Sentencing, and Appeal*

The jury found Watson guilty of all charges, and found his murder of Triantos was of the first degree. The trial court sentenced Watson to 37 years to life in prison. This consisted of 25 years to life for Triantos's murder and one additional year, to be served consecutively, for the deadly weapon use enhancement attached to the murder count, and an additional determinate and consecutive term of 11 years for the count 2 and count 3 assaults with a deadly weapon of Edwards and Bessellieu-Hill. This 11-year determinate term consisted of an upper term of four years for count 2, plus one year (one-third the midterm) for count 3, plus two terms of three years each for the great bodily injury enhancements attached to those counts.

Watson filed a timely notice of appeal.

## II. DISCUSSION

### A. *Watson's Batson-Wheeler Claim*

Watson first argues we should reverse the judgment because the trial court erred in overruling his objection under *Batson, supra,* 476 U.S. 79, and *People v. Wheeler* (1978) 22 Cal.3d 258 (*Wheeler*) to the prosecutor's use of a peremptory strike in jury selection. The peremptory at issue was a strike against a juror we will refer to as "Prospective Juror No. 1," who Watson contends was the only African-American in the jury pool. The trial court ruled that Watson failed to establish a prima facie case that the prosecutor used this peremptory strike because of group bias and, even assuming he did, that he failed to prove the prosecutor acted with discriminatory intent in light of the prosecutor's credible, race-neutral reasons for excusing Prospective Juror No. 1.

14

### 1. Background

During voir dire, Prospective Juror No. 1 said she received an undergraduate degree in sociology in 2015 and was employed as a county social worker in the county's "Home Supportive Services," where she had worked for four years. She "assess[ed] recipient needs" and assigned care provider hours based on those needs, and her office helped provide a list of care providers that recipients could interview. She had to be "impartial and listen and be objective" regarding what clients and recipients told her. Even if sometimes clients have a history of domestic violence or drug or alcohol addiction, she had to "give them a fair treatment, fair response, a fair assessment" regardless of how she felt about it.

Asked if she had any exposure in her job to reporting anyone "for fraudulently seeking benefits," Prospective Juror No. 1 said, "Occasionally, we do have fraud. I mean, oftentimes, it's accidental." When there was fraud, she interacted with the county's welfare fraud investigation team. That team handled the investigation, but, she said, "we do talk to the recipients and say, Hey, . . . we know that this is going on; and we're probably going to have to reassess you and cut your hours if we find that . . . what you're stating is false."

Before voir dire, Prospective Juror No. 1 completed a questionnaire that asked about various topics, including personal experiences with alcohol and drug use. Asked in voir dire about her drug and alcohol use, she said she believed people should "be responsible and know [their] source," explaining she had read about three people overdosing on cocaine laced with fentanyl. She also said that once, at a home brews festival, she and a friend "got a little wild" and she woke up in a blackberry bush. She had changed her behaviors since that incident. She said, "I feel like as you get older, it's hard to have those nights. . . . It's just, like you pay for it a little bit more, so yeah. I mean,

15

we still like to go out and party and have fun.  I mean, we're in our twenties. . . . We don't have children. . . . [B]ut we're not doing that as much as we were."  She also said she had made some poor choices while under the influence, such as taking a chili bottle from a restaurant, but she had not done anything "crazy" that she would regret for her whole life.

The prosecutor exercised his second peremptory strike to excuse Prospective Juror No. 1, and Watson's counsel made her *Batson/Wheeler* objection.  She asserted that Prospective Juror No. 1 was the only person of African-American descent that she had "been able to discern so far" in the jury pool.  She contended Prospective Juror No. 1 was "very well educated" and that her "frank and open discussion about her previous alcohol use" would not benefit Watson because Watson intended to call an expert toxicologist to testify about the numerous drugs found in the victim's body (an apparent reference to Triantos), and because the evidence in each stabbing event showed "how the victims were the ones that were full of alcohol and full of drugs."  Also, Prospective Juror No. 1 "in her job as a social worker has to . . . initiate criminal investigations sometimes as part of her job."  Watson's counsel asserted that the only plausible reason for the prosecutor's peremptory challenge was because Prospective Juror No. 1 was African-American.

The prosecutor responded that he did not believe Watson was African-American, so he was not sure what the objection had to do with the case.  He continued, "But the juror is a social worker. . . . I consider what a person does for a living and what I think that their ability to serve on a jury will be.  An issue that sometimes social workers have is they think that the experience that sometimes people are—it's not their fault, it's the circumstances that they grew up in that they were raised in.  It's society's fault.  Social worker's

16

[sic] serve a very necessary function and help people and try to get them back on their feet. . . . So that's a very admirable role, but I don't think that's necessarily that's the best for what we're here to do in the issue of guilt versus not guilt. In addition, she has personally experienced abusing alcohol to the point where she does abuse it to excess and admitted to blacking out. In her questionnaire, she also had a very bad drug trip. That type of abuse of substances to become inebriated, I felt is potentially exemplary of bad decision-making, so I didn't think it would be appropriate for her to serve on this jury. In addition, the witnesses here obviously are going to be talking about being out drinking alcohol and consuming it. I felt like that would be something that is too close to this juror's own personal experience." Watson's counsel responded that Prospective Juror No. 1, while a social worker, "initiates and participates in criminal cases for Welfare fraud for abusing . . . hours." As for her drinking, defense counsel pointed out that another prospective juror had "admitted that he . . . made cannabis edibles, . . . and ate so much that he started hallucinating, yet he remains on the jury."[3] That prospective juror had said he had done this once and had not tried it again.

After a short recess, the court overruled Watson's *Batson/Wheeler* objection. The court found that Watson had not made a prima facie case of impermissible discrimination under *Batson/Wheeler* and, further, even if he had, that the prosecutor had sufficiently proffered race-neutral reasons for his exercise of the peremptory strike.

---

[3] The prosecutor later used a peremptory strike to excuse this other prospective juror as well. We do not consider this later use of a strike because the court did not know of it when it ruled on Watson's *Batson/Wheeler* objection.

17

## 2. Legal Standards

Our Supreme Court summarized the relevant law as follows: " ' "Both the federal and state Constitutions prohibit any advocate's use of peremptory challenges to exclude prospective jurors based on race." ' (*People v. Parker* (2017) 2 Cal.5th 1184, 1210 (*Parker*).)[4] ' "Doing so violates both the equal protection clause of the United States Constitution and the right to trial by a jury drawn from a representative cross-section of the community under article I, section 16 of the California Constitution." ' (*Id.* at p. 1211.) The law also recognizes ' "a rebuttable presumption that a peremptory challenge is being exercised properly, and the burden is on the opposing party to demonstrate impermissible discrimination." [Citation.] "A three-step procedure applies at trial when a defendant alleges discriminatory use of peremptory challenges. First, the defendant must establish a prima facie showing that the prosecution exercised a challenge based on impermissible criteria. Second, if the trial court finds a prima facie case, then the prosecution must offer nondiscriminatory reasons for the challenge. Third, the trial court must determine whether the prosecution's offered justification is credible and whether, in light of all relevant circumstances, the defendant has shown purposeful race discrimination. [Citation.] 'The ultimate burden

---

[4] Presumably because Watson's trial took place in 2021, the argument he advances rests solely on federal and state constitutional grounds. Notably, as a result of a legislative change that took effect in 2022, a peremptory challenge is now considered to be statutorily improper if the trial court determines there is a substantial likelihood that "an objectively reasonable person" would view prohibited group bias such as race "as a factor in the use of the peremptory challenge." (Code of Civ. Proc., § 231.7, subds (d)(1) & (i); see Assembly Bill No. 3070 (2019–2020 Reg. Sess.) (Stats. 2020, ch. 318, §§ 1–3).) Watson makes no claim that this new statutory standard applies in this case or otherwise affects the proper analysis of his challenge to the peremptory strike of Prospective Juror No. 1.

of persuasion regarding [discriminatory] motivation rests with, and never shifts from, the [defendant].' " ' (*Ibid.*)" (*People v. Holmes, McClain and Newborn* (2022) 12 Cal.5th 719, 759–760.)

We first review the trial court's step-one finding that Watson failed to establish a prima facie case of impermissible discrimination. (See *People v. Scott* (2015) 61 Cal.4th 363, 385–391 (*Scott*) [clarifying appellate review of *Batson*/Wheeler motions].) The Attorney General argues we should do so under a substantial evidence standard of review (see *People v. Battle* (2021) 11 Cal.5th 749, 772 (*Battle*)). Watson argues that here, where it is unclear what standard of proof the court applied in making its step-one finding, we should independently decide whether the record permits an inference that the prosecutor excused jurors on prohibited discriminatory grounds (see *People v. Garcia* (2011) 52 Cal.4th 706, 747). We need not resolve this debate because we conclude the court's ruling was correct under either standard.

A defendant satisfies the first step of a *Batson*/*Wheeler* inquiry "by producing evidence sufficient to permit the trial judge to draw an inference that discrimination has occurred." (*Johnson v. California* (2005) 545 U.S. 162, 170; see also *People v. Rhoades* (2019) 8 Cal.5th 393, 428.) This "low threshold" (*Scott, supra*, 61 Cal.4th at p. 384) should not "be so onerous that a defendant would have to persuade the judge—on the basis of all the facts, some which are impossible for the defendant to know with certainty—that the challenge was more likely than not the product of purposeful discrimination." (*Johnson*, at p. 170.)

"The ultimate issue is not whether there is a pattern of systematic exclusion, but instead ' " 'whether a particular prospective juror has been challenged because of group bias.' " ' " (*Battle, supra*, 11 Cal.5th at p. 773.) Certain types of evidence are especially relevant to this inquiry, including

whether the prosecutor has struck most or all of the members of the jury pool from an identified group, whether a party has used a disproportionate number of strikes against members of that group, whether the party has engaged prospective jurors of that group in only desultory voir dire, whether the defendant is a member of that group, and whether the victim is a member of the group in which the majority of the remaining jurors belong.  (*Scott, supra*, 61 Cal.4th at p. 384.)

We may also consider nondiscriminatory reasons for the challenged strikes "that are apparent from and 'clearly established' in the record." (*Scott, supra*, 61 Cal.4th at p. 384.)  But we may do so only when these reasons "necessarily dispel any inference of bias," such that " 'there is no longer any suspicion . . . of discrimination in those strikes.' " (*Ibid*.)  "[T]he fact that the prosecutor volunteered one or more nondiscriminatory reasons for excusing the juror is of no relevance at the first stage."  (*Scott, supra*, 61 Cal.4th at p. 390.)

### 3.  Step-One Analysis

Watson argues that, because Prospective Juror No. 1 participated in fraud investigations in her social worker position and because another juror who abused drugs was not excused at the time of Watson's *Batson/Wheeler* objection, the prosecutor's stated reasons for striking Prospective Juror No. 1—the possible ramifications of her social worker position and her use of substances—were obviously insincere shams disguising the prosecutor's true motive in striking Prospective Juror No. 1, which was racial discrimination. We disagree.  Prospective Juror No. 1 testified that she was a social worker, which caused the prosecutor to have a concern that explained his use of a peremptory strike.  (See *People v. Mai* (2013) 57 Cal.4th 986, 1053 ["The prosecutor's expressed reservation about having social workers on the jury was race neutral" and "had ' " 'some basis in accepted trial strategy' " '

20

[citation] insofar as it stemmed from a concern about the general attitudes and philosophies persons in that profession might harbor."].) We fail to see how her testimony that she dealt with fraud in her work raised an inference that the prosecutor's concern about her chosen profession was a sham. Prospective Juror No. 1 did not indicate that her "fraud" work was significant or unusual. She said she only dealt with fraud "[o]ccasionally" and, even then, that "oftentimes" the fraud was "accidental." Further, her statement about what "we" told possible fraudsters suggests all the social workers in her office occasionally dealt with fraud, rather than it being a task in which she was especially engaged. This minimal level of activity can hardly be said to create an inference that the prosecutor's concern about Prospective Juror No. 1's social work occupation—again, which type of concern has been recognized as a legitimate basis for using a peremptory strike—was a sham.

Watson's argument that he raised an inference below that the prosecutor's concerns about Prospective Juror No. 1's substance use were also a sham because another, unchallenged prospective juror said he once hallucinated after taking cannabis edibles is also unpersuasive. Prospective Juror No. 1's description of what she did—going out partying—was more similar to the events of the case, and she also acknowledged that she had made some poor choices while under the influence. Further, she said that she continued to "go out and party," even if, as she put it, "we're not doing that as much as we were." These are meaningful differences with which Watson does not grapple.

That leaves us with Watson's contention that the prosecutor's peremptory challenge of the only African-American in the jury pool also raises an inference of racial discrimination. We disagree. Certain types of evidence especially relevant to our inquiry, as these types are discussed in

21

*Scott, supra*, 61 Cal.4th at p. 384, undermine Watson's contention. The prosecutor's voir dire of Prospective Juror No. 1 was hardly desultory, but instead was lengthy, taking place on two different court days. "Although circumstances may be imagined in which a prima facie case could be shown on the basis of a single excusal, in the ordinary case, . . . to make a prima facie case after the excusal of one or two members of a group is very difficult." (*People v. Bell* (2007) 40 Cal.4th 582, 598, fn. 3, disapproved on another ground in *People v. Sanchez* (2016) 63 Cal.4th 665, 686, fn. 13). "While no prospective juror may be struck on improper grounds, . . . it [is] ' "impossible" ' as a practical matter, to draw the requisite inference where only a few members of a cognizable group have been excused and no indelible pattern of discrimination appears." (*People v. Garcia, supra*, 52 Cal.4th at p. 747; see *People v. Edwards* (2013) 57 Cal.4th 658, 698 ["merely assert[ing] that [a][p]rospective [j]uror . . . was Black, and that there appeared to be only one other Black prospective juror . . . [was] insufficient" to establish a prima facie case].) Because there is nothing else in the record to support an inference of race-based discrimination, that Prospective Juror No. 1 was African-American is by itself insufficient to establish a prima facie case of discrimination by the prosecutor.

### 4. Step-Three Analysis

We also have no reason to disagree with the trial court's statement that, even if it had found defendant had made a prima facie case of racial discrimination, it would have concluded that the prosecutor had sufficiently proffered race-neutral reasons for his exercise of the peremptory strike.

In a step-three inquiry, "after a prosecutor has posited a race-neutral explanation for a peremptory challenge, 'the trial court must decide whether the movant has proven purposeful discrimination. [Citation.] In order to prevail, the movant must show it was " 'more likely than not that the

22

challenge was improperly motivated.' " [Citation.] This portion of the *Batson/Wheeler* inquiry focuses on the subjective genuineness of the reason, not the objective reasonableness. [Citation.] At this third step, the credibility of the explanation becomes pertinent. To assess credibility, the court may consider, " 'among other factors, the prosecutor's demeanor; . . . how reasonable, or how improbable, the explanations are; and . . . whether the proffered rationale has some basis in accepted trial strategy.' " ' " (*People v. Woodruff* (2018) 5 Cal.5th 697, 753.)

"At step three, courts look to all relevant circumstances bearing on the issue of discrimination. [Citation.] Relevant circumstances may include the race of the defendant, the ultimate racial composition of the jury, the pattern of strikes, and the extent or pattern of questioning by the prosecutor during voir dire. [Citations.] A court may also consider the fact that the prosecutor impermissibly struck other jurors 'for the bearing it might have upon the strike' of the challenged juror . . . [and] comparative juror analysis may be probative of purposeful discrimination at *Batson's* third stage. [Citation.] We defer to a trial court's ruling only if the court has made a ' "sincere and reasoned effort to evaluate the nondiscriminatory justifications offered" ' by the prosecutor." (*People v. McDaniel* (2021) 12 Cal.5th 97, 122.)

Here, as we have discussed, exercising a peremptory challenge because a prospective juror is a social worker is a plausible, race-neutral reason (*People v. Mai, supra*, 57 Cal.4th at p. 1053), and Watson gives us no reason to doubt the sincerity of the prosecutor's concern in doing so. Watson also provides us with no reason to doubt the sincerity of the prosecutor's concerns about Prospective Juror No. 1's use of substances, another race-neutral reason to exercise a peremptory strike, both in terms of what it said about her decision-making and how it might affect her reaction to the facts of the

case. Further, these concerns had a basis in a plausible, acceptable trial strategy regarding two cases involving what could be reasonably characterized as bar fights between persons who may have in one way or another imbibed. Finally, the totality of the circumstances supports the court's rejection of Watson's contention that the prosecutor engaged in purposeful race-based discrimination—as we have discussed, the defendant was not African-American, there was no pattern of peremptory strikes used for African-American prospective jurors, and the prosecutor engaged in a thorough voir dire of Juror No. 1.

In short, Watson's *Batson*/*Wheeler* claim is without merit.

## B. *Watson's Right to a Public Trial and Related Ineffective Assistance of Counsel Claims*

Watson next argues that the trial court denied him his right to a public trial.

According to Watson, because of COVID-19 pandemic restrictions, his trial was held in a courtroom that was too small to accommodate members of his family, members of Triantos's family, and members of the press and general public. At a hearing on motions in limine prior to trial, the court denied what was effectively a joint motion from both sides to move to another, larger courtroom. But at no point did Watson make a right-to-public-trial argument in connection with that motion, or at any other time.

In the alternative, Watson argues that, if we conclude he has forfeited his claim of denial of the right to a public trial, we should reach the merits anyway because his counsel's failure to raise the issue constituted ineffective assistance of counsel (IAC).

We conclude Watson has forfeited this claim, and we reject his attempt to avoid the forfeiture by arguing IAC.

24

### 1. Background

On March 4, 2020, the Governor of California declared a state of
emergency due to the global COVID-19 outbreak; the President of the United
States subsequently declared a national emergency. (*People v. Breceda*
(2022) 76 Cal.App.5th 71, 76, 80.) On March 23, 2020, the Chief Justice of
our Supreme Court issued an order suspending all jury trials for 60 days,
explaining that courts could not continue to operate and comply with
increasingly stringent social distancing measures required by the emerging
pandemic. (*Id.* at p. 82.) The next week, the Chief Justice issued a
statewide emergency order authorizing superior courts to extend statutory
deadlines and use available technology to conduct remote judicial
proceedings in light of the need for courts to continuously operate and courts
" 'clearly' " being " 'places with high risks during this pandemic.' " (*Id.* at
pp. 82–83.) A series of statewide emergency orders followed restricting
normal court operations and in-person access by members of the public to
trial proceedings. (*Id.* at p. 83; *Stanley v. Superior Court* (2020)
50 Cal.App.5th 164, 166–168.)

The parties acknowledge that pandemic-related protocols for trial
courts were in place when Watson's trial began in June 2021. Just before the
trial began, at the hearing on motions in limine, the prosecutor moved for the
court to conduct the trial in Courtroom One rather than in the assigned
Courtroom Three. He explained that family members of Triantos, the man
stabbed to death in 2018, wanted to observe the trial in person, cited Marsy's
Law,[5] and asserted that Courtroom One had an extra row that allowed two

---

[5] Marsy's Law grants crime victims the right to be present and heard at
any hearing at which the rights of the victims are at issue. (Cal. Const.,
art. I, § 28, subds. (b)(7)–(8); see *In re Vicks* (2013) 56 Cal.4th 274, 282–283.)

additional persons to observe the trial and the court to maintain compliance with a public health directive that people stay six feet apart in the courtroom.

Watson's counsel responded that she had "no preference" about where the trial was heard. She continued, "I don't believe it's either the prosecution or the defense's position. That's a State of California court staff, the court CAO job. So I express no position." She went on to ask that, in the event of a move, the victim's family be admonished "to conduct themselves in a manner that comports with courtroom etiquette," representing that Triantos's father and mother each had previously approached her in a verbally aggressive manner.

The prosecutor agreed with this admonishment request. In doing so, he indicated that the victims' families could also view the trial via a YouTube broadcast. Watson's counsel then stated that Watson had family who might also want to be present at the trial, although counsel was "not sure what the policy is on having outside observers now." The prosecutor quickly added that if the court were going to "be opening up to the public those last two seats" and Watson had family that wanted to be present, then it "would be reversible error if the defendant was not allowed to have someone in here but the . . . victims were allowed to be here specifically." After some back and forth, including about the access of other members of the public and the media, Watson's counsel suggested each side be allowed one seat if the trial were moved to Courtroom One. The prosecutor responded that he thought "members of the general public . . . would have to be able to have access to those seats also," and suggested they first see if a move was possible and then work out the particulars. Watson's counsel stated that perhaps media people who wanted to could rebroadcast the trial or take photographs "from YouTube," and submitted the matter to the court.

26

The court said it had no preference between the two courtrooms.  It added that, "as [defense counsel] has pointed out, a lot of those decisions are made outside of this courtroom."  It said it would check whether a courtroom change was possible and added, "[W]e are still on Covid protocols as designated by the Department of Public Health.  And as we have been for the past year and a half or so, we're doing the best we can."

The next day, the court informed the parties that it had "sp[oken] with [the] courthouse CEO."  The court denied the request to change the courtroom and added, "Perhaps if things change as we go forward, we'll be able to revisit it."

## 2. Legal Standards

A criminal defendant has a constitutional right to a public trial that is guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution and article I, section 15 of the California Constitution.  (*Waller v. Georgia* (1984) 467 U.S. 39, 46 (*Waller*); *People v. Woodward* (1992) 4 Cal.4th 376, 382; see also § 686(1) [a criminal defendant is entitled to "a speedy and public trial"].)  " ' " 'The requirement of a public trial is for the benefit of the accused; that the public may see he is fairly dealt with and not unjustly condemned, and that the presence of interested spectators may keep his triers keenly alive to a sense of their responsibility and to the importance of their functions.' " ' "  (*Waller*, at p. 46.)  "In addition to ensuring that judge and prosecutor carry out their duties responsibly, a public trial encourages witnesses to come forward and discourages perjury."  (*Ibid.*)  The right to a public trial creates a " 'presumption of openness' " that " 'may be overcome only by an overriding interest based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest.' "  (*Id.* at p. 45.)

More specifically, to justify the closure of courtroom proceedings, there must be "an overriding interest that is likely to be prejudiced"; "the closure must be no broader than necessary to protect that interest"; the court "must consider reasonable alternatives to closing the proceeding"; and it "must make findings adequate to support the closure." (*Waller*, *supra*, 467 U.S. at p. 48; *Presley v. Georgia* (2010) 558 U.S. 209, 214; *People v. Bui* (2010) 183 Cal.App.4th 675, 682.) When the trial court orders closure, it must articulate the overriding interest justifying the closure, " 'along with findings specific enough that a reviewing court can determine whether the closure order was properly entered.' " (*Waller*, at p. 45; *Bui*, at p. 682.)

A criminal defendant is not "required to prove specific prejudice in order to obtain relief for a violation of the public-trial guarantee." (*Waller*, *supra*, 467 U.S. at p. 49 & fn. 9; *Arizona v. Fulminante* (1991) 499 U.S. 279, 310 [describing the deprivation of a public trial as a "structural defect affecting the framework within which the trial proceeds, rather than simply an error in the trial process itself"].)

A criminal defendant may forfeit his or her right to a public trial by failing to object on that ground below. (*People v. Virgil* (2011) 51 Cal.4th 1210, 1236–1237 [defendant forfeited for lack of objection claim that the sidebar questioning of jurors violated his constitutional right to a public trial].) " 'A defendant "may, by his own acts or acquiescence, waive his right [to a public trial] and thereby preclude any subsequent challenge by him of an order excluding the public. Unlike the jury trial right which requires an express personal waiver [citation], the constitutional guarantee of a public trial may be waived by acquiescence of the defendant in an order of exclusion." [Citations.]' [Citation, italics omitted.]" (*Ibid.*; *People v. Covarrubias* (2016) 1 Cal.5th 838, 917 [" ' "The right to public trial may be

waived [citation], the waiver may be implied from failure to object [citations], and the waiver may be made by defense counsel on defendant's behalf." ' "].)

### 3. Analysis

The People argue that we need not address the merits of Watson's right to a public trial claim because he forfeited it by failing to raise it below. Watson argues his counsel's statements at the hearing below were sufficient to preserve his claim. We agree with the People.

Watson's counsel did not at any time below raise his right to a public trial. To the contrary, her statements at the motions in limine hearing indicate Watson acquiesced to the public access restrictions in place because of the COVID-19 protocols the court was required to follow. At first, Watson's counsel expressed no preference about the trial's location and conceded the issue was a "job" for "the court CAO." She conditionally joined in the prosecutor's motion by asserting that, if the trial were moved, Watson wanted one of the two additional seats that would be made available reserved for his family in case they wanted to be present in the courtroom, and she did so while suggesting that the court's policy regarding outside observers was paramount. Her lack of any concern about a public trial was made evident by her suggestion to the court that, should the trial be moved to Courtroom One, any media people who wanted to rebroadcast the trial or obtain photos of it could do so from YouTube.

Watson argues that, although his counsel at first "acquiesced to a nonpublic trial," her joining in the prosecutor's "request for a public trial where members of [Watson's] family could attend" preserved her claim on appeal. This is unpersuasive because, to the extent Watson's counsel joined in the prosecutor's motion, that motion was based on the desire of Triantos's family members to be present in the courtroom and Marsy's Law, not on Watson's right to a public trial.

29

In short, by failing to raise the issue below and acquiescing to the limitations placed on the public's access to the trial because of the COVID-19 pandemic, Watson has forfeited this appellate claim.[6]

### 4. Watson's Ineffective Assistance of Counsel Claim

Watson further argues that, should we conclude he has forfeited his public trial claim, we still should reverse because his trial counsel's failure to raise his right to a public trial below constitutes IAC.

In order to prevail on an IAC claim, a defendant must show that his or her counsel's representation was unreasonable under "prevailing professional norms" and that, as a consequence, defendant was prejudiced. (*Strickland v. Washington* (1984) 466 U.S. 668, 687–688, 692 (*Strickland*); *People v. Ledesma* (1987) 43 Cal.3d 171, 215–216 (*Ledesma*.) In order to establish prejudice, a defendant normally must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." (*Strickland*, at p. 694.)

It is rare that we address IAC claims on direct appeal. Regarding the reasonableness of a counsel's representation, it is not sufficient on direct appeal for a defendant to contend that his counsel's " ' "tactics were poor, or that the case might have been handled more effectively. [Citations] [¶] Rather, the defendant must affirmatively show that the omissions of defense counsel involved a critical issue, and that the omissions cannot be explained

---

[6] Watson's merits argument includes the contention that we must reverse because the trial court failed to articulate any overriding interest justifying rejection of the motion to move the trial to Courtroom One and abdicated its judicial responsibility by allowing the court's administration to make the decision. These contentions highlight the problem with Watson's failure to raise his right-to-public-trial claim below: the court had no reason to address aspects of the issue that Watson now complains it did not consider *because* of his failure.

on the basis of any knowledgeable choice of tactics." [Citations.]' " (*People v. Blomdahl* (1993) 16 Cal.App.4th 1242, 1248.) Further, "competency is presumed unless the record affirmatively excludes a rational basis for the trial attorney's choice." (*People v. Musselwhite* (1998) 17 Cal.4th 1216, 1260, italics omitted.) When the record sheds no light on counsel's actions or omissions, " 'unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation, these cases are affirmed on appeal.' " (*People v. Avena* (1996) 13 Cal.4th 394, 418, italics omitted.)

We are not convinced that trial counsel's failure to object on right to a public trial grounds fell below an objective standard of reasonableness. There were plausible tactical reasons for not doing so. His counsel's first reaction to the prosecution's motion was to ask the court to admonish Triantos's family to conduct themselves appropriately in the courtroom, saying his father and mother had both approached her in a verbally aggressive manner. In light of the possibility that Triantos's family members might engage in such further behavior at trial, which might negatively influence the jury, it was reasonable for Watson's counsel to join in the prosecution's motion in only a limited fashion and nothing more.

Further, it was reasonable for Watson's counsel to believe that any motion to move the trial to Courtroom One based on Watson's right to a public trial would be rejected for good reason. As we have discussed, at the time of appellant's trial, COVID-19 protocols precluded normal court operations and restricted in-person access by members of the public to trial proceedings, which instead were apparently made available to the pubic via YouTube. It was reasonable for Watson's counsel to conclude under these circumstances that the trial court, had it articulated reasons for denying a

31

request to move the trial so that two additional seats could be made available to the public based on Watson's right to a public trial, would have rejected the motion, and in doing so adequately articulated a sufficient overriding interest justifying its decision.

We therefore reject Watson's IAC claim for lack of any showing of deficient performance and do not address the issue of prejudice.

## C. *Watson's Attorney-Client Privilege and Related Claims*

Watson next argues the trial court erred by allowing the prosecutor to question him briefly on cross-examination, over defense objection, about his discussions with his trial attorney about his defense strategy, both because this was attorney-client privileged information and because the court should have prohibited it under Evidence Code section 352 as unduly misleading. He opposes the People's contention that he has forfeited his attorney-client privilege argument by failing to raise it below and, here too, argues in the alternative that his counsel's failure to object on that ground constituted IAC.

### 1. The Challenged Cross-Examination

At trial, Watson testified that he acted in self-defense in both the 2016 and 2018 incidents. During his cross-examination, the prosecutor had the following exchange with him:

"[PROSECUTOR]: Okay. So you've been in custody for how long now?

"[WATSON]: Two and a half years, approximately 32 months now.

"[PROSECUTOR]: And you've talked to your attorney about your strategy for defense, right?

"[WATSON]: A few times.

"[PROSECUTOR]: And you know you're claiming self-defense, correct?

"[WATSON]: Absolutely.

32

"[PROSECUTOR]:  So she's described the law to you for self-defense, hasn't she?"

Defense counsel objected to this last question under Evidence Code section 352 and on relevance grounds.  After a bench conference, the court overruled the objection.  The cross-examination continued as follows:

"[PROSECUTOR]:  So did you talk to your attorney about self-defense?

"[WATSON]:  Somewhat.

"[PROSECUTOR]:  Are you aware that words alone are not a justification for the use of violence?

"[WATSON]:  Umm, in the eyes of the law, maybe."

In closing argument, the prosecutor, while playing portions of Watson's interview with the police detective shortly after the 2018 incident, repeatedly argued that Watson's self-defense claim was not credible.  After playing one portion of the interview, he told the jury that the detective "walked through every bit of the ridiculous statement [Watson] was giving.  [Watson] is, like, 'Yeah, well, that does sound kind of fishy when you say it out loud.'  Again, this is two days after he killed [Triantos], and he still doesn't know if [he is] going with self-defense or if [he is] going with, oh, it wasn't even me there. He doesn't know what he's going to ultimately do and present his defense. He hasn't had the benefit of two and a half years of counsel. . . ."

### 2. Watson **Has Forfeited His Attorney-Client Privilege Claim**

The People argue that Watson has forfeited his attorney-client privilege claim by failing to object to the prosecutor's questioning on that ground below.  (See *People v. Wilson* (2005) 36 Cal.4th 309, 336 [defendant forfeited attorney-client privilege claim regarding prosecutor's cross-examination of him by failing to object on that ground below under Evidence Code, § 912, subd. (a) (governing waiver of the privilege)].)

33

Watson argues against forfeiture, contending that the trial court had a sua sponte duty to stop the disclosure of his attorney-client privileged discussions and failed to do so. We are not aware of any such duty, and the authority Watson cites does not show the trial court had such a duty under the circumstances that existed below. (See *Stearns v. Los Angeles City School District* (1966) 244 Cal.App.2d 696, 723 [privilege asserted by the court on behalf of an *absent* party regarding questions to the party's former attorney, citing Evidence Code section 916 (providing in subdivision (a) that a presiding officer of a proceeding, including on his or her own motion, "shall" exclude privileged information sought from a person *not* authorized to claim the privilege in the absence of a "party to the proceeding who is a person authorized to claim the privilege")]; *People v. Vargas* (1975) 53 Cal.App.3d 516, 527 [citing *Stearns* and Evidence Code section 916, held, trial court should have disregarded and excluded from evidence revelations by the attorney of an absent defendant about defendant's privileged statements].) Unlike that authority, Watson was a party to the proceeding below, present and represented by counsel, and the person disclosing the information.

We conclude that Watson has forfeited his privilege claim. His only objections to the prosecutor's cross-examination questions were on Evidence Code 352 and relevance grounds, which were insufficient to preserve his privilege claim on appeal. (*People v. Wilson*, *supra*, 36 Cal.4th at p. 336; *People v. Clark* (2016) 63 Cal.4th 522, 603 [the defendant's "failure to object on this specific ground [attorney-client privilege] below forfeits his claim on appeal"].)

### 3. Watson's IAC and Evidence Code Section 352 Claims Fail for Lack of Prejudice

Watson argues his IAC claim in both his direct appeal and his habeas petition and argues his Evidence Code section 352 claim in his direct appeal.

34

As we have discussed, to prevail on an IAC claim, a party must show that his counsel's representation was unreasonable under "prevailing professional norms" and that, as a consequence, he was prejudiced. (*Strickland, supra,* 466 U.S. at pp. 687–688, 692; *Ledesma, supra,* 43 Cal.3d at p. 216.) Prejudice is established by demonstrating "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." (*Strickland,* at p. 694.)

Evidence Code section 352 provides, "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." "Error under Evidence Code section 352 is evaluated under the standard of harmless error set forth in *People v. Watson* (1956) 46 Cal.2d 818. (*People v. Marks* (2003) 31 Cal.4th 197, 227; *People v. Earp* (1999) 20 Cal.4th 826, 878.) Under the *Watson* standard, reversal is required only if[, as with an IAC claim,] 'it is reasonably probable that a result more favorable to the appealing party would have been reached in absence of the error.' " (*People v. Orey* (2021) 63 Cal.App.5th 529, 549.)

We conclude Watson cannot prevail on his IAC and Evidence Code section 352 claims because, assuming for the sake of argument deficient performance by counsel and error occurred as he contends, it is not reasonably probable that he would have fared better at trial but for those things. The matter at the center of both claims—the prosecutor's cross-examination of Watson about his discussions with his trial counsel—involved brief and shallow questioning that merely solicited from Watson the acknowledgements that he talked to his counsel "[a] few times" about his defense strategy, that he knew he was claiming self-defense, and that he

35

talked with his counsel about self-defense "somewhat." None of Watson's acknowledgements suggests that he or his counsel engaged in any improper discussions, or give a significant reason to conclude his trial testimony lacked credibility. It is hardly surprising that Watson, facing very serious charges, including a murder charge, would discuss all aspects of his defense with his trial counsel—rather, it would be surprising if he did not. In other words, the prosecutor's questioning merely led to Watson's acknowledgement of the obvious, and jurors likely would have assumed he engaged in such discussions whether or not he acknowledged that he had done so.

Further, to the extent the prosecutor sought by his questioning to suggest that Watson fabricated a self-defense strategy after consulting with his attorney in the years after the 2018 incident, this suggestion is thoroughly belied by evidence presented—by both parties—that Watson made statements in the days immediately after that incident indicating he acted in self-defense. For example, Watson's girlfriend reported to police that Watson, upon his return to his apartment immediately after the incident, said that he was "jumped by six people," acted in self-defense, and ended up "having to stab someone." Watson's statements to a police detective a few days later, while they straddled the fence between his acting in self-defense and his not remembering what had occurred, show he was already saying he must have acted in self-defense. A few days after he made those statements, Watson told his girlfriend he was going to try to "plead self-defense as much as possible" but knew he had "fucked up." In other words, Watson's testimony at trial is consistent with the posture he repeatedly took in the immediate aftermath of the incident.

In his habeas petition, Watson emphasizes his trial testimony that he did not want to fight Triantos again because of injuries, that Triantos had

knocked his hat off his head, and that in the alley Triantos had struck him and looked to be about to pull out a weapon, causing Watson to fight just to survive. Watson contends this evidence supports a voluntary manslaughter conviction based on the reasonable or unreasonable belief in the need to engage in self-defense. He contends the prosecutor's cross-examination led the jury to believe this defense was "insincere."

We disagree. The jury had multiple good reasons to doubt the credibility of Watson's trial testimony that had nothing to do with what he said he discussed with his trial counsel. Regarding the 2016 incident, the undisputed evidence indicates Watson was the aggressor in the initial fight; Watson himself testified that he punched Edwards for fear of being attacked after Edwards told him to "[g]et the fuck out of here," and because he was irritated by the remark. Further, witness testimony, such as by a friend of Edwards and Bessellieu-Hill that Watson told him immediately after the initial fight, " 'Your friends aren't gonna be so cool once I get my friends and my piece,' " the testimony of both Edwards and Bessellieu-Hill that they were attacked upon exiting the bar's back door into the alley,[7] and the severity of Edwards's and Bessellieu-Hill's injuries compared to any Watson suffered, indicate that Watson contacted accomplices and that they together assaulted Edwards and Bessellieu-Hill in the alley behind the bar. Watson's contention that he just happened to encounter two people he knew in the alley,

---

[7] There was some inconsistency between the statements of Edwards and Bessellieu-Hill right after the incident to police and their trial testimony in that they at first said they did not know who stabbed them but identified Watson as their stabber at trial. This inconsistency is of little import given that the descriptions the two gave to police of the person who they initially fought with in the front of the bar were consistent with Watson's appearance, they first spoke to police when they were in significant medical distress, and Watson admitted at trial that he stabbed Bessellieu-Hill.

whereupon he was attacked by Bessellieu-Hill and Edwards, is hardly believable in light of this evidence.

Regarding the 2018 incident, Watson, in his trial testimony about the initial fight with Triantos and Rios and its aftermath, contended that he punched Triantos because he thought he was going to be jumped after exchanging words with Rios and Triantos and observing Rios "posturing up." This also indicates he was the aggressor in the initial fight. Watson further testified that after this initial fight was broken up and he found the woman who had given him a ride to the bar to be incoherent, he walked towards an alley near the bar in order to go to a parking lot where his ride's car was parked, not wanting to fight any longer. But the video of the street and alley entrance played at trial indicates otherwise. That is, the video and related testimony show that some time after the initial fight in front of the bar, Watson and others headed towards the alley; that Watson was left alone by Triantos and the others as he went to pick up his hat in the street; and that Watson picked up his hat and, rather than walk away, as he testified he could have done, including in order to go to the parking lot, he headed without hesitation into the alley. In other words, the video indicates Watson, left alone by Triantos and the others, chose to follow them into the alley, indicating he wanted to continue the confrontation.

There is also the evidence of the 2018 stabbing itself. Although Triantos's companion that night, Rios, testified at trial that he could not remember what happened, he told police shortly after the incident that Watson took out a knife and stabbed Triantos repeatedly in what amounted to a fist fight. Watson's own testimony essentially confirms this—he acknowledged that he stabbed Triantos in the alley after Triantos punched him in the forehead and swung at him several more times. Also, the 2018

video shows the two disappearing into the alley for only about 14 seconds, indicating that Watson resorted to his knife very quickly. And, while others were present in the alley, there is no evidence that anyone other than Watson was armed with a weapon capable of causing serious injury or death or that anyone, other than Rios shoving him at the alley entrance, fought with Watson in the alley. This further demonstrates the criminality of Watson's act because " 'deadly force or force likely to cause great bodily injury may be used only to repel an attack which is in itself deadly or likely to cause great bodily injury . . . .' " (*People v. Hardin* (2000) 85 Cal.App.4th 625, 629–630; see *People v. Pinholster* (1992) 1 Cal.4th 865, 966 ["The right of self-defense did not provide defendant with any justification or excuse for using deadly force to repel a nonlethal attack"], disapproved on other grounds in *People v. Williams* (2010) 49 Cal.4th 405, 459.)

There is also evidence that Watson believed he had the right to be physically aggressive towards others in ways that the law does not countenance. First of all, there are the 2016 and 2018 incidents themselves. The evidence indicates that in each case Watson initiated a fist fight when encountering a purely verbal conflict in the belief that he was acting to defend himself and that, when he did not prevail in the initial fist fight, resorted to knifing those he fought with rather than walk away from the situation. Watson also acknowledged on cross-examination that he had recently physically attacked a cellmate when the cellmate disrespected him and assumed a physical posture suggesting he was going to fight Watson. This evidence further undermines Watson's self-defense claims.

Finally, Watson was a very unimpressive witness on his own behalf. Besides the testimony we have already discussed, he was continually belligerent and argumentative towards the prosecutor during cross-

39

examination, commenting on the prosecutor's questions, such as by calling them ridiculous, and even refusing to answer questions despite the court's instruction that he answer. His behavior on the stand gave the jury additional reason to question his account of events.[8]

For these reasons, we conclude that the jury very likely would have rejected Watson's claim that he acted in self-defense even if the prosecutor had not been allowed to cross-examine him regarding his discussions with his trial counsel. There is no reasonable probability that Watson would have fared better at trial but for the deficient performance by counsel or court errors he contends occurred. His IAC and Evidence Code section 352 claims, therefore, fail.

### D. *Watson's Claim Regarding the Second Amended Information*

Watson next argues that the trial court erred in permitting the prosecution to amend its information near the end of the trial to revise and add to its allegations regarding the 2016 incident. In its first information, the prosecution had alleged in count 2 that Watson had assaulted both Edwards and Bessellieu-Hill with a deadly weapon. The trial court allowed the prosecution to amend the information so as to allege two separate counts of assault with a deadly weapon, one regarding Edwards and one regarding Bessellieu-Hill, and to include a great bodily injury enhancement allegation in each count.

The People argue Watson has partially waived this claim because by acquiescing below and that, regardless, it lacks merit.

---

[8] The jury was instructed that Watson "did not have the right to refuse to answer questions in this case. You may consider that refusal during your deliberations."

40

### 1. Background

Watson's preliminary hearing was held in April 2019, at which Edwards and Bessellieu-Hill testified that he stabbed them during an incident in February 2016.  Most relevant here, Bessellieu-Hill testified that, after the initial fight with Watson in front of the bar was broken up, bar bouncers led Edwards and Bessellieu-Hill to the bar's back door so they could avoid Watson by leaving through a back alley.  As the two exited the bar's back door, Bessellieu-Hill saw several people, including Watson, in the alley, and was attacked by up to three or four people.  As he helped Edwards get up from the ground, he saw Watson out of the corner of his eye stab him, Bessellieu-Hill, in the back, side, and neck.

Edwards testified at the hearing that Watson and at least four other people attacked Bessellieu-Hill and him when the two exited the bar's back door.  When Watson punched at him, Edwards ducked, took Watson to the ground, and got on top of him as people punched and kicked Edwards.  After jumping up and starting to back out of the alley, Edwards noticed his jacket and pants were soaked with blood.  When Bessellieu-Hill came out of the alley also covered in blood and said he had been stabbed, Edwards realized he had been stabbed as well.  He subsequently learned he had been stabbed four times on the left side of his back, and showed the court what the court described as "three evident wounds on his back."  He did not see who stabbed him but thought that Watson stabbed him "from underneath . . . , reaching around and stabbing" him as he held Watson down.  Edwards suffered a punctured lung and diaphragm and needed three months to recover from his injuries.

Soon after the preliminary hearing, the district attorney filed an information charging Watson in count 1 with the murder of Triantos with the

41

use of a deadly weapon and in count 2 with the assault of both Edwards and Bessellieu-Hill with a deadly weapon.

In the latter part of Watson's trial, at a hearing about jury instructions, the prosecutor said he would be moving to amend the information to separate count 2 into different counts. He said someone else had chosen to charge only one count but, given the preliminary hearing transcript and the trial evidence presented so far, he thought it appropriate to amend to have separate counts that alleged an assault of Edwards in one and Bessellieu-Hill in the other. Defense counsel argued the request was "way too . . . late in the game," to which the prosecutor replied that evidence was still being presented and that an amendment would even be appropriate during jury deliberations.

Shortly thereafter, the prosecution, on the same day that it rested its case, moved to file an amended information separating count 2 into two separate counts and filed a request for an order shortening the time for the motion to be heard. The prosecutor contended that "[h]aving both victims charged in one [c]ount may confuse the jury in the event they wish to convict [Watson] as it relates to one victim and acquit [him] as it relates to the other victim." The prosecutor also sought to allege a great bodily injury enhancement under section 12022.7, subdivision (a) regarding Watson's alleged assault of Edwards. The court issued the order shortening time as requested.

At court the next day, the prosecutor said that, given Bessellieu-Hill's trial testimony the day before, the prosecution also "might be seeking to add [an] additional special allegation." Watson's counsel stated that "it would be fine to separate out Count Two" because that would "fix[] a defect in the pleading." However, she opposed adding additional enhancements because they "would have to be plead [sic] and proven at the preliminary hearing" and

42

because of lack of sufficient notice. The trial court deferred ruling on the motion.

Three days later, on the same day that the defense rested its case, the prosecutor withdrew its proposed amended information and moved for leave to file a second amended information. The prosecutor sought to separate count 2 into two different counts and include great bodily injury special allegations under section 12022.7, subdivision (a) in *both* of the new counts; he also filed another request for an order shortening time, which the court issued. At a hearing on this new motion the next day, the prosecutor argued the new allegations were supported by evidence presented at the preliminary hearing and allowed under California's liberal amendment rules. He contended that, because of the prosecution's previous motion, the defense was "aware of what the requested amendments were prior to concluding their case and would have had the opportunity, if they needed to, to present any evidence in their defense related to those allegations." He added that he was not opposed to the reopening of the defense case if necessary.

Watson's counsel responded, "I would agree to the extent that there's a liberal amendment in California, especially to correct defects. I would agree that Count Two is likely a defective count in that the main victims were not separated out, . . . but the People are not entitled to liberal amendments, especially at this late stage; and my client is entitled to notice and due process. So I am objecting to any adding of the great bodily injury enhancements that adds potentially six years exposure that he was not on notice of. . . . It is an abuse of the liberal amendment in California, and it violates notice and due process."

The trial court allowed the prosecution to file its second amended information, concluding that "the state of the evidence at this time would

43

make the amendments . . . appropriate" and "the amendments will make the deliberations of the jury less confusing."

Watson did not ask to reopen his defense case or for a continuance. The next trial day, the prosecutor presented rebuttal evidence, which completed the parties' presentation of evidence.

## 2. Waiver

The People argue that we need not address Watson's claim to the extent he argues the trial court erred by allowing the prosecution to separate the original count 2 assault charge into two different counts. According to the People, Watson waived this part of his claim when his trial attorney agreed below that this amendment was proper to cure a defect in the original information. (*People v. Saunders* (1993) 5 Cal.4th 580, 590, fn. 6 ["waiver is the 'intentional relinquishment or abandonment of a known right' "].)

Watson argues he did not waive his claim, pointing out that the trial counsel statement cited by the People was made with regard to the prosecution's first motion to amend the information, and argues his counsel objected entirely to the prosecution's second motion, granted by the court a few days later, to file a second amended information. We agree that the People's argument is not based on any remarks made by Watson's counsel regarding the operative motion and information. Thus, we reject their waiver argument and proceed to the merits of Watson's claim.

## 3. Legal Standards

"Both the Sixth Amendment of the federal Constitution and the due process guarantees of the state and federal Constitutions require that a criminal defendant receive notice of the charges adequate to give a meaningful opportunity to defend against them. [Citations.] 'Notice of issues to be resolved by the adversary process is a fundamental characteristic of fair procedure.' [Citation.] 'The "preeminent" due process principle is that one

44

accused of a crime must be "informed of the nature and cause of the accusation." [Citation.] Due process of law requires that an accused be advised of the charges against him so that he has a reasonable opportunity to prepare and present his defense and not be taken by surprise by evidence offered at his trial.' " (*People v. Seaton* (2001) 26 Cal.4th 598, 640–641; *People v. Neal* (1984) 159 Cal.App.3d 69, 73 [defendant has "the right to notice that the prosecution is seeking enhanced punishment"].))

Section 1009 governs amendments of an accusatory pleading. It provides in relevant part, "The court . . . may order or permit an amendment of an . . . information . . . for any defect or insufficiency, at any stage of the proceedings . . . . The defendant shall be required to plead to such amendment . . . forthwith, . . . unless the substantial rights of the defendant would be prejudiced thereby, in which event a reasonable postponement, not longer than the ends of justice require, may be granted. An . . . accusation cannot be amended so as to change the offense charged, nor an information so as to charge an offense not shown by the evidence taken at the preliminary examination."

"After the defendant has entered a plea, amending the accusatory pleading requires leave of court, which may be granted or denied in the court's discretion provided the amendment does not 'change the offense charged' or otherwise prejudice the defendant's substantial rights." (*People v. Anderson* (2020) 9 Cal.5th 946, 958.) The central question is whether an amendment "changes the offense charged to one not shown by the evidence taken at the preliminary examination." (*People v. Superior Court* (*Mendella*) (1983) 33 Cal.3d 754, 764, superseded by statute on other grounds as stated in *People v. Baries* (1989) 209 Cal.App.3d 313, 321.) " ' "The information plays a limited but important role—it tells a defendant what kinds of offenses

45

he is charged with and states the number of offenses that can result in prosecution. However, the time, place, and circumstances of charged offenses are left to the preliminary hearing transcript. This is the touchstone of due process notice to a defendant. . . ." [¶] . . . [¶] . . . [A]n information need not notify a defendant of all the particulars of the crime charged. That role is left to the preliminary hearing transcript.' " (*People v. Peyton* (2009) 176 Cal.App.4th 642, 657–658, italics omitted.)

Accordingly, " 'inasmuch as he is furnished with a copy of the transcript of the proceedings at the preliminary hearing, [a defendant] has notice of any charge that under [section 1009] may be placed against him by amendment of the information. The section itself preserves the substantial rights of the party to a trial on a charge of which he had due notice, and that is all the Constitution requires.' " (*People v. Flowers* (1971) 14 Cal.App.3d 1017, 1020; quoted approvingly in *People v. Brown* (1973) 35 Cal.App.3d 317, 322–323; cf. *People v. Rogers* (2016) 245 Cal.App.4th 1353, 1361–1362 [prosecution may not add a great bodily injury enhancement to an information after a defendant has waived a preliminary hearing because there was no evidence to support the new allegation].)

Consistent with this case law, "generally . . . [an] information may be amended even as late as trial" (*People v. Edwards* (1991) 54 Cal.3d 787, 827; *People v. Garringer* (1975) 48 Cal.App.3d 827, 833 [no denial of due process to permit amendment of an information during trial "if the amendment does not change the nature of the offense charged nor prejudice the defendant's rights"]), including "as late as the close of trial if no prejudice is shown" (*People v. Villagren* (1980) 106 Cal.App.3d 720, 724; accord, *People v. Flowers supra*, 14 Cal.App.3d at p. 1020). If necessary, the trial court may grant a

continuance.  (§ 1009; see also *People v. Murphy* (1973) 35 Cal.App.3d 905, 923.)

We review a court's grant of a motion to amend an information for abuse of discretion.  (*People v. Villagren*, *supra*, 106 Cal.App.3d at p. 724.)

### 4. Analysis

The trial court did not abuse its discretion in permitting the prosecution to amend the information near the end of trial.  The evidence presented at the preliminary hearing, in particular the testimony of Bessellieu-Hill and Edwards, gave Watson ample notice that he might face the charges and enhancements contained in the second amended information.

Section 12022.7 provides that "[a]ny person who personally inflicts great bodily injury on any person other than an accomplice in the commission of a felony or attempted felony shall be punished by an additional and consecutive term of imprisonment in the state prison for three years." (§ 12022.7, subd. (a).)  Under section 12022.7, " 'great bodily injury' means a significant or substantial physical injury."  (§ 12022.7, subd. (f).)  In *People v. Escobar* (1992) 3 Cal.4th 740 (*Escobar*), our Supreme Court held that a "significant or substantial physical injury" need not meet any particular standard for severity or duration, but need only be "a substantial injury beyond that inherent in the offense itself."  (*Id*. at pp. 746–750 [disapproving of *People v. Caudillo* (1978) 21 Cal.3d 562 on this point], italics omitted.) " ' "Whether the harm resulting to the victim . . . constitutes great bodily injury is a question of fact for the jury." ' "  (*Escobar*, at p. 750.)

Both Bessellieu-Hill and Edwards testified at the preliminary hearing that Watson stabbed them multiple times, causing them significant injury. Their testimony undoubtedly gave notice to Watson of possible assault counts and of possible enhancement allegations under section 12022.7.  They described injuries that are well within the scope of similar injuries courts

47

have found constitute great bodily injury. (See, e.g., *Escobar*, at p. 750 [extensive bruises and abrasions over victim's legs, knees, and elbows and other injuries severe enough to significantly impair the victim's ability to walk]; *People v. Le* (2006) 137 Cal.App.4th 54, 57–58, 59 [soft tissue and muscular injury from a gunshot, which made the victim "unable to walk, stand, or sit unassisted for weeks"]; *People v. Bustos* (1994) 23 Cal.App.4th 1747, 1755 [multiple contusions, lacerations, and abrasions, including on face, elbow, thigh, knee, and anus]; *People v. Harvey* (1992) 7 Cal.App.4th 823, 827–828 [blistering second degree burns with visible discoloration and disfigurement for at least a month requiring repeated medical treatments].)

Further, Watson fails to show that the addition of the great bodily injury enhancement allegations under section 12022.7 required him to present new evidence to defend himself. It would be impossible for him to so contend persuasively because the stabbings were central to the prosecution's long-standing contentions that he assaulted Edwards and Bessellieu-Hill with a knife. Tellingly, Watson did not seek a trial continuance after the amendments were allowed despite the prosecutor's amenability to one, a clear indication that Watson's counsel did not consider one to be necessary.

Watson argues that the People were estopped from amending their information under *People v. Mancebo* (2002) 27 Cal.4th 735 (*Mancebo*) because their amendment of the information altered a discretionary charging decision rather than correct a mistake or an act of excusable neglect. *Mancebo* is inapposite. There, our Supreme Court held that the trial court had erred by imposing a One Strike sentence under section 667.61 based on an *unpled* multiple victim circumstance. (*Mancebo*, at pp. 739–754.) The court also limited its holding to its "construction of the language of section 667.61," which required that the relevant circumstances be " 'pled and

48

proved.'" (*Id.* at pp. 741, fn. 4 & 745, fn. 5.) It was only in this context that the *Mancebo* court agreed with the appellate court that the prosecution's failure to allege a multiple victim circumstance was "a discretionary charging decision" that invoked the "doctrines of waiver and estoppel, rather than harmless error"; indeed, the court emphasized that "the information never alleged the multiple victim circumstance and was never amended to include it, nor was its numerical subdivision (subd. (e)(5)) ever referenced in the pleadings." (*Id.* at pp. 740, 749.) Here, we do not evaluate a trial court's decision to impose a sentence based on an unpled circumstance under section 667.61 but, rather, its decision to allow an amendment to an information during trial under other law in conformance with evidence presented at the preliminary hearing. *Mancebo* has no bearing here.

In short, Watson was on notice from the evidence presented at the preliminary hearing of the charges he might have to defend against and had an opportunity to present his defense in response to the amendments. Accordingly, his claim fails.

### E. *Watson's* Marsden *and Related IAC Claim*

Watson next argues that (1) the trial court erred by denying his motion, made after trial under *Marsden*, *supra*, 2 Cal.3d 118, for new counsel, and (2) he received ineffective assistance of counsel in presenting a defense. Both claims are related to his trial counsel's failure to show him his 2018 police interview, including before he testified at trial, and to move for excerpts of that interview to be admitted into evidence to counter those played by the prosecution in rebuttal, failures that he expands upon in his habeas petition. The People make various arguments against these claims.

We need not discuss Watson's claims in great detail. We conclude that, assuming for the sake of argument that the court erred in denying his

*Marsden* motion and that his counsel's performance was deficient, he suffered no prejudice under the standards we are to apply to these claims.

### 1. Legal Standards

Regarding Watson's *Marsden* motion, our constitutional protections require that an attorney be appointed for any defendant who cannot afford to hire counsel. (*Gideon v. Wainwright* (1963) 372 U.S. 335; *People v. Smith* (1993) 6 Cal.4th 684, 690 (*Smith*).) A defendant is entitled to have that attorney replaced with another court-appointed lawyer (*Marsden, supra,* 2 Cal.3d at p. 123), including after conviction (*Smith,* at p. 694), upon a substantial showing that the defendant's right to adequate representation will be substantially impaired if counsel is not replaced. (*Marsden*, at p. 123; *Smith,* at pp. 690–691, 696.)

We review the denial of a *Marsden* motion for abuse of discretion. (*People v Smith*, *supra*, 6 Cal.4th at pp. 690–691.) Reversal is only called for if an erroneous denial has occurred that is prejudicial under federal constitutional standards; that is, we reverse if the error is not shown to be harmless beyond a reasonable doubt. (*People v. Loya* (2016) 1 Cal.App.5th 932, 945, citing *Chapman v. California* (1967) 386 U.S. 18.)

As we have already discussed, to prevail in an IAC claim, a party must show that his counsel's representation was unreasonable under "prevailing professional norms" and that, as a consequence, he was prejudiced. (*Strickland, supra*, 466 U.S. at pp. 687–688, 692; *Ledesma, supra*, 43 Cal.3d at p. 216.) Prejudice is established by demonstrating "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." (*Strickland*, at p. 694.)

### 2. Watson's *Marsden* Claim

Watson testified at trial about the 2018 incident, indicating that he acted in self-defense throughout, was not associated with any gangs, and had

not gotten into fights for years.  In rebuttal, the prosecution played excerpts of his video-recorded 2018 police interview (2018 video).  As we have discussed, Watson stated in these excerpts that, while he thought he had acted in self-defense, he remembered very little about the stabbing incident. He said that there was "no way to justify what happened" and then added, "let's just say this was just me defending myself as usual okay something like this happened before"; that he had "too much of a temper" to go out and had often gotten into fights with people he knew who were "busting [his] balls," which was "kind of what happened" initially this time; that he was "jumped"; that someone else threw the first punch, though he did not remember who because he was so drunk; that he tried to find the girls who drove him to the bar after the initial fight in order to get away; that it might not have been him who stabbed Triantos and that he did not decide to stab him; that he had been gangbanging "forever," was part of a Eureka gang, and that "as far as the way we handle things I guess I can never let anybody just bug me"; that he had a "habit" of throwing things away such as his knife; and that he ran home after the incident. To counter the prosecution's rebuttal evidence, Watson's counsel moved for the court to play the entire 2018 video under the rule of completeness contained in Evidence Code section 356, which the prosecution opposed.[9]  At a Friday hearing, the prosecutor suggested that Watson's counsel propose other excerpts from the 2018 video be played, and Watson's counsel indicated she had a few in mind.

---

[9] Evidence Code section 356 states, "Where part of an act, declaration, conversation, or writing is given in evidence by one party, the whole on the same subject may be inquired into by an adverse party; when a letter is read, the answer may be given; and when a detached act, declaration, conversation, or writing is given in evidence, any other act, declaration, conversation, or writing which is necessary to make it understood may also be given in evidence."

The trial court took the defense motion under submission. That weekend, Watson's counsel apparently went to Las Vegas and never made a proposal to play other excerpts of the 2018 video. On Monday, the trial court denied the defense motion.

After trial, at a hearing to set a date for sentencing, Watson's trial counsel told the court she did not intend to file a motion for a new trial and asked it to appoint independent counsel to confer with Watson about any ineffective assistance of counsel issues Watson might have. This led to the court holding a *Marsden* hearing to determine if new counsel should be appointed.

At the *Marsden* hearing, Watson told the court his counsel had provided ineffective assistance because she (1) did not show him the 2018 video before trial, which, if he had seen, would have led to him taking a plea deal; (2) failed to make three court appearances during trial and decided to go on vacation to Las Vegas in the middle of trial; (3) gave an ineffectual closing argument to the jury that did not state his defense; and (4) did not do what he asked of her in presenting his defense. He made other contentions as well, but identified as his most important issues his counsel's failure to show him the 2018 video and deliberate with him about it; he believed that, if he had had seen the video and discussed it with her sufficiently, he would have taken the plea deal. He told the court he had lied during the 2018 police interview, and that the excerpts played at trial made his trial testimony, though truthful, seem disingenuous.

His trial counsel responded that she and Watson "met plenty of times" over the two years before the trial. Although she had not shown him the 2018 video, "he was . . . there and we had talked about it multiple times." The defense strategy was to play the entire video at trial under the rule of

completeness in response to the excerpts played by the prosecution, but the court had rejected that request. Further, she had counseled Watson against testifying at trial, and had discussed his testimony with him several times upon his insisting he would testify. Also, she had "strongly, strongly implored" Watson to take the prosecution's plea offer of a 16-year determinate term with a waiver of all his credits, but Watson had considered it "ridiculous" and wanted a 10-year term with all of his credits applied.

Watson explained his reason for rejecting the prosecution's plea offer: "I really believed that the truth would at some point set me free . . . . I had been [in jail] for two and a half years already. I felt I had done in two years what some people take ten years to do of a personal evolution in that time and I just felt that . . . my best option was to be as honest as possible up there on that stand and just did not work out whatsoever."

The court took the motion under submission and denied it at a subsequent hearing. It concluded that Watson's counsel had provided a "robust defense"; that it was "compelling" that Watson's counsel had discussed the 2018 video with him at length several times prior to trial and that Watson was actually present when the video was made; and that the differences between Watson and his counsel were not necessarily irreconcilable.

On appeal, Watson in his *Marsden* claim highlights his counsel's failure to show him the 2018 video before trial and her lack of response to the excerpts played by the prosecution, such as by moving to play other excerpts that purportedly show him in a different, better light (Watson did not raise this latter point in the *Marsden* proceedings below). Watson contends the judgment against him should be conditionally reversed because "[t]here can be little doubt that the video . . . was crucial evidence" and, given the

53

"numerous, potentially damaging statements that [he] made during the interview, and the unfavorable way in which the video portrayed him, it was crucial that [he] view the video before testifying." Citing *People v. Sanchez* (2011) 53 Cal.4th 80, 92–93 and *Smith*, *supra*, 6 Cal.4th at pp. 695–696, he argues that new counsel should be appointed for him upon remand to investigate and, if found, present grounds for a new trial based upon ineffective assistance of counsel for the trial court's consideration.

### 3. Watson's IAC Claim

In his IAC claim made on direct appeal, Watson argues his trial counsel provided him with ineffective assistance because she did not show him the 2018 video before he testified at trial, "set[ting] him up for impeachment that destroyed the credibility of his defense." Also, he contends it was unreasonable for his trial counsel not to show him the 2018 video in seeking to dissuade him from testifying. Watson further contends it was reasonably probable that the jury rejected his self-defense contention because he was so heavily impeached by the excerpts of the 2018 video that the prosecution played in rebuttal.

In his habeas petition, Watson adds that his counsel provided him with ineffective assistance by her failure to proffer other excerpts of the 2018 video in response to those shown by the prosecution, and he provides a written list of excerpts she could have played for the jury. Many of them contain statements similar to or consistent with those played for the jury. These excerpts include Watson stating that he knew he was at the stabbing incident; that he had "defended myself like that before" and that "none of it turned into anything"; that "I don't know . . . how I got into it with them all I remember is that they had these fucking boots on kept dinking my fucking head around and then when I went to leave and find my friend you know there they are"; that he was "just defending" himself; that he did not

54

remember deciding to do "something malicious"; that he was "just trying to recall . . . why in the hell did all this happen"; that the only decision he made was to go out and "get drunk lose my mind"; that when he stabbed Triantos he was "in survival mode"; that all he remembered was "getting knocked down" and that he "[h]onest to god truth" did not recall hitting Triantos; that he had "enough memory" to know he "was there" but did not know "what went down"; that he "was scared"; that he did not know that he stabbed Triantos; that he "just felt like [he] was going to die," referring to "bad seizures" that he had when "this all happens," but that "if I tell you that's how I felt or that's what I thought that's the lie cause I don't know what I was thinking"; that he did not remember stabbing Triantos or getting into a scuffle with Rios; and that he had been out of gangbanging and taking care of his daughter.

### 4. Harmless Error

Assuming solely for the sake of argument that the court committed *Marsden* error and that Watson's counsel assisted him unreasonably under prevailing professional norms, we conclude these errors were harmless.

At the heart of Watson's claims is his contention that his trial counsel provided ineffective assistance by not showing him the 2018 video, which he claims would have caused him to accept the prosecution's plea offer, not testify at trial, or better prepare to testify. His main complaint is that he stated things in the prosecution's 2018 video excerpts that were inconsistent with his trial testimony, causing the jury to find his self-defense claim incredible. These include his 2018 statement that he did not recall what occurred during the stabbing incident versus his detailed trial testimony of what occurred; his 2018 statement that he was a gang member versus his trial testimony that he was not; and his 2018 statement that what he did was not justified and that he had done this sort of thing before versus his

55

trial testimony that he acted in self-defense and had not been involved in fights for some time.

Watson's contentions are unpersuasive. Whatever inconsistencies the jury may have noticed between his 2018 statements and his trial testimony are of little significance in light of ample other evidence that established his guilt for the charges against him and raised issues about the credibility of his trial testimony independent of those excerpts. We have extensively recounted much of this evidence in concluding there was no prejudice caused by any deficient performance of his trial counsel or error by the court in allowing the prosecutor to cross-examine him on his discussions with his counsel in section II.C.3 above. Watson, in his trial testimony about his initial fight with Triantos and Rios and its aftermath, contended that, thinking he was going to be jumped after exchanging words with Rios and Triantos and observing Rios "posturing up," he punched Triantos in the mouth; this indicates he was the initial aggressor. Further, his trial account of that incident is contradicted by video of the street and alley entrance that was played for the jury. It shows, among other things, that Watson, left alone in the street, had the opportunity to walk away from the others but instead chose to stride into the alley where they were located, indicating he was looking to continue the confrontation. Just as significantly, Rios's account to police shortly after the incident indicates that Watson essentially stabbed Triantos during a fist fight.

Other evidence presented at trial other than the prosecution's 2018 video excerpts also raises questions about Watson's credibility. For example, Watson's trial testimony that he no longer was gangbanging is inconsistent with the testimony of Bessellieu-Hill and Edwards in 2016 and Rios in 2018 that he told them he was associated with a gang. Further, Watson himself

indicated at trial that he told Bessellieu-Hill and Edwards who he was "affiliated with," an apparent reference to gang association, even if it is unclear whether he meant a past or present affiliation.

Also, the 2018 video excerpts that the prosecution played for the jury are not as inconsistent with Watson's trial testimony as he claims. For example, although Watson said in 2018 that what he did was not justified, he followed this statement immediately with the assertion that he acted in self-defense, and also said in the excerpts played at trial that he had been jumped. And as we have already discussed in section II.C.3 above, he made various statements in the days after the 2018 incident indicating that he had acted in self-defense, further diminishing the impact of any statements to the police detective in 2018 that could be interpreted as suggesting otherwise. Watson's 2018 statement that he had gotten into a lot of fights also was consistent with his own trial testimony that he had been in "plenty of fights."

It is true that certain aspects of Watson's 2018 statements raise issues about his credibility. For example, besides those we have mentioned, he indicated in 2018 that he did not throw the first punch in front of the bar, but he acknowledged at trial that he did. Still, Watson fails for at least four reasons to establish that anything in the prosecution's 2018 video excerpts was so damaging to his case that it possibly could have caused him to take a plea offer by the prosecution to serve 16 years with a waiver of his credits. First, the record indicates the prosecution was only willing to discuss, but did not actually propose, this plea offer, which undermines the premise of

Watson's contention that he would have taken such a deal.[10]  Second, as the trial court pointed out at the conclusion of the *Marsden* hearing, the evidence indicates that Watson had knowledge of what he said in his 2018 police interview because of his own participation in it, and because he discussed the 2018 video—and his possible trial testimony—with his trial counsel extensively—an assertion with which Watson did not disagree.  Watson nowhere asserts that his trial counsel failed to inform him of the problems with his police interview and, indeed, nowhere asserts that he actually asked his trial counsel to show him the 2018 video upon discussing it or his trial testimony with her.  It is reasonable to infer from the circumstances that his counsel informed him of the problems with the 2018 video.  Third, despite his knowledge and these discussions, he was, as his trial counsel told the court during the *Marsden* hearing, scornful of any such plea offer when his counsel strongly implored him to take it, whether or not the prosecution actually made such an offer.

Fourth, his knowledge of his 2018 police interview and his discussions with his trial counsel cast serious doubt on his assertion that, if he had

---

[10] Just prior to jury selection, the trial court told Watson about what it characterized as a "proposed disposition" that included a sentence of 16 years and eight months, which the court indicated it would accept.  The next day, Watson's counsel indicated she had met with Watson and did "not have a resolution."  The prosecutor then told the court that, while there had been some discussion of a negotiated disposition along the lines referred to by the court the previous day, the prosecution had not actually made such an offer.  The court acknowledged it had made a mistake in characterizing that discussion as an offer.  Watson suggests that, regardless, the court said it would impose an "indicated sentence" of 16 years and eight months (see, e.g., *People v. Smith* (2014) 227 Cal.App.4th 717, 730 ["An indicated sentence falls 'within the boundaries of the court's inherent sentencing powers and, in contrast to plea bargains, prosecutorial consent is not required' "]), but the record does not support this assertion.

viewed the 2018 video, he would not have testified. As we have discussed, despite this knowledge and these discussions, he chose to testify against his trial counsel's advice—and, again, he nowhere asserts that she failed to advise him of the problems the prosecution's excerpts could cause him if he chose to testify. He also fails to explain how he could have better prepared to testify under these circumstances.

In the end, Watson was convicted of Triantos's murder because of ample evidence that he brought a knife to a fist fight and used it without legal justification. Further, the prosecution's 2018 video excerpts may have been inconsistent with some of his trial testimony, but these inconsistencies pale in significance compared to this and other evidence casting much doubt on his self-defense claim.

As for Watson's argument in his habeas petition that his trial counsel should have sought to play other excerpts of the 2018 video in response to the prosecution's excerpts, as our extensive review of the excerpts he proffers in his habeas petition shows, they add little to the impression created by the excerpts played by the prosecution. His claim of self-defense at trial is undermined by his acknowledgement in the excerpts *proffered by him* that, as he also indicated in the excerpts played by the prosecution, he could not recall what he did or what he was thinking throughout most of the incident. Further, the proffered excerpts are much in the same vein as those played by the prosecution—indicating that, although he cannot recall what he did or thought, he thought he was defending himself at the time. Assuming for the sake of argument that his trial counsel unreasonably failed to play these excerpts for him in preparation for trial, we fail to see any prejudice to Watson from that failure for the reasons that we have discussed.

59

In short, we cannot see how the appointment of a different attorney would have gained Watson a new trial (or, for that matter, had any effect on the sentence imposed) and cannot see any prejudice from the ineffective assistance of counsel Watson claims to have received. Therefore, we reject his *Marsden* and IAC claims.

## F. *Watson's Resentencing Claims*

### 1. Watson's Sentence for Count 2

Watson next argues he was improperly sentenced for his count 2 conviction in light of the post-trial enactment of Senate Bill No. 567 (2021–2022 Reg. Sess.) (Sen. Bill 567), which altered certain determinate sentencing provisions in Penal Code section 1170. The People agree. We conclude that Sen. Bill 567, which became effective on January 1, 2022 (Stats 2021, ch. 731, § 1.3; see *People v. Flores* (2022) 73 Cal.App.5th 1032, 1039), applies retroactively to Watson's case.

At the time of Watson's sentencing in October 2021, the trial court had discretion under section 1170 to select the lower, middle, or upper term that best served the interests of justice. (See *People v. Achane* (2023) 92 Cal.App.5th 1037, 1041.) California Rules of Court provide that the "relevant circumstances may be obtained from the case record, the probation officer's report, other reports and statements properly received, statements in aggravation or mitigation, and any evidence introduced at the sentencing hearing." (Cal. Rules of Court, rule 4.420(d).)

Sen. Bill 567 amended section 1170 to require the trial court "to impose a term of imprisonment not exceeding the middle term" unless certain circumstances exist. (Legis. Counsel's Dig., Sen. Bill 567 (2021–2022 Reg. Sess.), ch. 731, p. 1.) The trial court may impose an upper term only where (1) there are circumstances in aggravation and the facts underlying the aggravating circumstances have been established by stipulation or proof at

60

trial beyond a reasonable doubt (*ibid.*; § 1170, subd. (b)(1) & (2)), or (2) the defendant has prior convictions, as found by the court based on certified records (Stats. 2021, ch. 731, § 1.3; § 1170, subd. (b)(3).) (See *People v. Lopez* (2022) 78 Cal.App.5th 459, 466.)

Our Supreme Court has held that, absent evidence to the contrary, the Legislature intends an amendment to a statute that reduces the punishment for a particular crime to apply to all defendants whose judgments are not yet final on the amendment's operative date (*In re Estrada* (1965) 63 Cal.2d 740, 744–748; see *People v. Superior Court* (*Lara*) (2018) 4 Cal.5th 299, 307–308), as is the case with Watson. Because there is no indication the Legislature intended Sen. Bill 567's amendments to section 1170, subdivision (b) to apply prospectively only, they retroactively apply to Watson. (See *People v. Flores, supra*, 73 Cal.App.5th at p. 1039 [amended version of section 1170, subdivision (b), applies retroactively].)

Here, the trial court imposed an upper term sentence of four years for Watson's count 2 assault conviction. In sentencing him on this count, the court stated: "[T]here was a request to strike or reduce the enhancement. The Court's going to respectfully deny that. In fact, I'll go further and say that I believe that the Court would not be inclined to reduce any time that is going to be imposed for Mr. Watson, which is the maximum that the Court can impose, because I think that he deserves to be imprisoned for every minute of it." However, the court did not state the specific factors upon which it was relying in imposing the upper term of four years. Regardless of the court's expressed sentiment in favor of a maximum sentence for Watson's count 2 conviction, therefore, it could have imposed this maximum sentence based on factors that were neither admitted by Watson nor found to be true beyond a reasonable doubt by the jury. We agree with Watson that under

61

these circumstances it would be speculative for us to conclude the court's error, based on the retroactive application of Sen. Bill 567, was harmless. As a result, we will vacate Watson's four-year sentence for count 2 and remand this case to the trial court for resentencing.

The People argue that our remand regarding both sentencing matters addressed in this opinion should be limited to the determinate portion of Watson's sentence, but they do not provide any reasoned argument or authority for this assertion. Although Watson does not contest this assertion or otherwise address the issue, we see no reason to limit the remand in accordance with the position taken by the People in light of our Supreme Court's instruction that, " '[w]hen a case is remanded for resentencing by an appellate court, the trial court is entitled to consider the entire sentencing scheme. Not limited to merely striking illegal portions, the trial court may reconsider all sentencing choices. [Citations.] This rule is justified because an aggregate prison term is not a series of separate independent terms, but one term made up of interdependent components.' " (*People v. Burbine* (2003) 106 Cal.App.4th 1250, 1258; see also *People v. Buycks* (2018) 5 Cal.5th 857, 893 ["when part of a sentence is stricken on review, on remand for resentencing 'a full resentencing as to all counts is appropriate, so the trial court can exercise its sentencing discretion in light of the changed circumstances' "].)

We will remand to the trial court for a full resentencing. The 25-year-to-life sentence for Watson's first degree murder conviction is not a discretionary component of his aggregate sentence, but the court does have the discretion on remand to impose a one-year consecutive sentence for the accompanying enhancement under section 12022, subdivision (b)(1) or strike that enhancement (see *People v. Jones* (2007) 157 Cal.App.4th 1373, 1378–

1379).  On remand, the court may consider this exercise of discretion along with its other sentencing choices.[11]

### 2. Watson's Sentence for The Count 3 Enhancement

Watson also argues the trial court erred in imposing a full three-year term for the great bodily injury enhancement attached to count 3 and instead should have imposed one-third of this amount, meaning a one-year term.  The People agree.  We do as well.

When a defendant is convicted of more than one felony offense, the calculation and imposition of a determinate sentence is generally governed by section 1170.1.  (*People v. Williams* (2004) 34 Cal.4th 397, 401–402.)  "If the sentencing court imposes consecutive terms, 'the aggregate term of imprisonment for all these convictions shall be the sum of the principal term, the subordinate term, and any additional term imposed for applicable enhancements for prior convictions, prior prison terms,' " and prior offenses committed while released on bail or recognizance.  (*People v. Sasser* (2015) 61 Cal.4th 1, 9.)

"The principal term consists of 'the greatest term of imprisonment imposed by the court for any of the crimes,' including any applicable offense-specific enhancements.  [Citation.]  The subordinate term consists of 'one-third of the middle term of imprisonment prescribed for each other felony conviction for which a consecutive term of imprisonment is imposed,' plus 'one-third of the term imposed for any specific enhancements applicable to those subordinate offenses.' " (*People v. Sasser, supra*, 61 Cal.4th at p. 9; see § 1170.1, subd. (a).)  A great bodily injury enhancement under section

---

[11] We do not intend to imply whether or not the court should again impose this one-year enhancement on remand, but merely note the court's discretion in order to explain the scope of our remand.

12022.7, subdivision (a) is a "specific enhancement" subject to the one-third limitation of section 1170.1. (§ 1170.11 ["As used in Section 1170.1, the term 'specific enhancement' means an enhancement that relates to the circumstances of the crime. It includes . . . the enhancement[] provided in Section[] . . . 12022.7 . . . ."].) A sentence fashioned in a manner unauthorized by law "exceeds the jurisdiction of the court and may be the subject of later review even though no objection was made in the trial court." (*People v. Mustafaa* (1994) 22 Cal.App.4th 1305, 1311.)

Here, the trial court sentenced Watson to 25 years to life plus one year for the deadly weapon use enhancement attached to count 1. It imposed an additional determinate term of 11 years for the assaults with a deadly weapon on counts 2 and 3, which consisted of an upper term of four years for count 2, one year (one-third the midterm) for count 3, and two terms of three years each for the great bodily injury enhancements attached to those counts. Since the count 3 sentence was the subordinate term for assault, the court erred in imposing a full term of three years for the great bodily injury enhancement attached to that count. Instead, the court should have imposed one-third of three years. Accordingly, we also vacate this part of Watson's sentence and, as we have said, we remand this case to the trial court for resentencing.[12]

### III. DISPOSITION

The judgment is affirmed, except that we vacate Watson's four-year sentence for count 2 and his three-year sentence for the great bodily injury

---

[12] Watson argues we should modify the judgment to impose a one-year enhancement. The People argue we should leave this issue for the trial court in light of our order that the case also be remanded for his resentencing on count 2. We agree with the People.

enhancement attached to count 3, and remand this case to the trial court for resentencing consistent with this opinion.

                                                            STREETER, J.

WE CONCUR:

BROWN, P. J.
HIRAMOTO, J.*

---

* Judge of the Superior Court of California, County of Contra Costa, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.